PORTER D. SMITH, as Administrator of the Estate of AMY A. SMITH, Deceased, Respondent, *v.* LEHIGH VALLEY RAILROAD COMPANY, Appellant.

NEGLIGENCE — ERRONEOUS CHARGE AS TO THE VERACITY OF WITNESS. An instruction upon the trial of an action for negligence that a witness as to an important fact had either perjured himself or had told the truth, thus forcing the jury to find one way or the other upon the issue, without any opportunity for finding that he might have been mistaken, constitutes reversible error.

*Smith* v. *Lehigh Valley R. R. Co.*, 61 App. Div. 46, reversed.

(Argued March 3, 1902; decided April 8, 1902.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered May 6, 1901, affirming a judgment in favor of plaintiff entered upon a verdict and an order denying a motion for a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Martin Carey* and *James McC. Mitchell* for appellant. It was error for the court to charge the jury that they must either find that the plaintiff's witness, Joseph W. Tuttle, told the truth that the crossing signals were not given and give full credit to his testimony, or find him guilty of deliberate perjury. (*Hoffman* v. *N. Y. C. & H. R. R. R. Co.*, 87 N. Y. 25; *Chapman* v. *E. R. Co.*, 55 N. Y. 579; *Phillips* v. *N. Y. C. & H. R. R. R. Co.*, 127 N. Y. 657; *Whitten* v. *Fitzwater*, 129 N. Y. 626; *Ives* v. *Ellis*, 169 N. Y. 85; 29 Am. & Eng. Ency. of Law, 766, 767; *Lawrence* v. *Maxwell*, 58 Barb. 511; *V. Nat. Bank* v. *Mills*, 99 N. Y. 656; Baylies' Trial Practice [2d ed.], 331; Abbott's Trial Brief [2d ed.], 450; *Allis* v. *Leonard*, 58 N. Y. 288; *Massoth* v. *D. & H. C. Co.*, 64 N. Y. 524; *Vail* v. *Rice*, 5 N. Y. 155.)

*Thomas Raines* and *Charles F. Miller* for respondent. The trial court committed no error in the charge or in the

refusal to charge. (*Groat* v. *Gile*, 51 N. Y. 431; *Cumming* v. *B. C. R. R. Co.*, 104 N. Y. 669; *McGinley* v. *U. S. L. Ins. Co.*, 77 N. Y. 495; *Brozek* v. *S. R. R. Co.*, 161 N. Y. 63; *Bailey* v. *Jourdan*, 18 App. Div. 387; *Lewis* v. *N. Y., L. E. & W. R. R. Co.*, 123 N. Y. 496; *Vandewater* v. *N. Y. & N. E. R. R. Co.*, 135 N. Y. 583; *Weber* v. *N. Y. C. & H. R. R. R. Co.*, 58 N. Y. 456; *Dolan* v. *D. & H. C. Co.*, 71 N. Y. 285; *Kettle* v. *Turl*, 162 N. Y. 255.)

GRAY, J. The plaintiff brought this action to recover damages for the death of his wife, which was alleged to have been caused by the negligence of the defendant. He recovered a verdict and the judgment thereupon has been affirmed by the Appellate Division, in the fourth department; with a dissent, however, by one of the justices. In the evening of February 25th, 1900, the plaintiff, his wife and five children were visiting at the residence of Joseph Tuttle; which was situated upon a highway leading to, and crossing, the defendant's road about a thousand feet away. The crossing went by Tuttle's name and was about 229 feet east of Farmington station. At that point, the railroad runs nearly east and west and the highway crosses it from north to south. From Tuttle's crossing, in a westerly direction, the railway is straight for about 4,000 feet. The plaintiff, with his family, left the Tuttle residence, about midnight, in a two-seated vehicle, drawn by two horses; which had, for protection against the weather, curtains upon the back and sides, extending so far forward as to require those sitting in front to make some effort to see beyond them, on either side of the way. The plaintiff's intestate, his wife, sat, with her three daughters, upon the back seat, in the interior of the vehicle. Upon the front seat sat the plaintiff and his two sons; one of whom was driving. The weather was intensely cold and a strong wind was blowing from the southwest, which filled the air with particles of snow and sleet. The curtains upon the vehicle had been fastened down and, in that condition, it was driven in the direction of the railroad crossing. When

approaching the tracks, the horses were allowed to walk ; but, when at a distance of some fifteen feet therefrom, they were urged into a trot and, while crossing the second, or south, track, the vehicle was struck by an east-bound train. The mother, three daughters and one of the sons were killed ; while the father and the son, who was driving, escaped. The train was, then, behind its schedule time, by some sixteen minutes, and it was proceeding at a rate of speed, which may have exceeded the rate of forty-five miles an hour. The plaintiff and his family were familiar with the neighborhood and that the train was due, and had not passed the station, was known to them.

According to the testimony of plaintiff and his son, they looked and listened, while approaching the crossing, and continued to do so ; but they heard no signal of the coming train, either by bell, or by whistle, and they saw nothing of the headlight, until the train was upon them. They say that the wind and the particles of snow and sleet made it almost impossible to see anything. The condition of the atmosphere was, however, not such as, continuously, to obstruct the vision ; for the plaintiff's witnesses agree that there were lulls in the wind storm and, in those intervals, a clear enough view might be had of distant objects. Tuttle and Power, two important witnesses for the plaintiff, saw the train at Keefe's crossing, a point upon the railroad about half a mile to the west of Tuttle's residence and of the crossing going by his name, and they were able to watch its approach. Tuttle saw it from his house and Power saw it from a point south of the railway ; both being about a half of a mile distant, and they say that it gave no signal of its approach. The fact that they saw the approaching train at so great a distance is not without significance ; for it evidenced the ability of any person to have seen it, also, if looking for it, in a lull of the storm.

With respect to the conduct of the deceased, it was testified by the plaintiff and by his son that, when the vehicle was approaching the railroad crossing and when within a few hundred feet therefrom, she spoke to those upon the front

seat and cautioned them to be careful and to look out for the cars. For the defendant it was testified by a large number of witnesses, composed of passengers on the train and of the defendant's employés, that the usual signals were given, by blasts of the whistle at the whistling post, eighty rods from the crossing, and by the continuous ringing of an automatic bell upon the engine.

Whether the defendant was negligent and whether the plaintiff's intestate was free from negligence contributing to her death, were questions of fact to be determined by the jury upon the evidence. That is clearly so with respect to the defendant; because the evidence was conflicting with respect to the management of the train, in giving notice of its approach. It is not, perhaps, as clear upon the other question. That is to say, it might seem as though the inmates of the vehicle, when within fifteen or twenty feet of the crossing, at the point where the horses were driven from a walk to a trot, might have been able to see up the track, upon which the train would come, for a sufficient distance to ensure safety, if they had waited for one of the lulls of the storm. At about thirty feet from the first, or northerly, of the two tracks, a person could see about 1,200 feet to the westward of the crossing; while at a point nearer the crossing, and in front of the depot, he could see to Keefe's crossing, half of a mile. As already observed, Tuttle and Power saw the train at Keefe's crossing. But it could not be said, as matter of law, that it was negligence for the inmates of the vehicle to cross the track, as and when they did. The train was behind its time. The plaintiff and his son, as they testified, were listening and looking continuously, before, and at the time of, crossing. These circumstances, with the conditions of the atmosphere making it difficult to see and with the natural supposition that they would not, deliberately, have proceeded, if they had seen, or heard, the train, make it difficult, if not impossible, to say, as matter of law, that there was such negligence on their part as to defeat a recovery. Whether it was the part of prudence to wait until the vision was unobstructed,

in the direction from which the train was to come, or whether they were, under the circumstances disclosed by the evidence, justified in attempting to cross the tracks, were questions for the jury·to pass upon. Whether persons have conducted themselves in a given case, with that degree of prudence which will absolve them from the consequences, is to be judged in the light of the particular surroundings, as shown by the evidence. No fixed rule can be formulated for all cases.

It was quite within the province of the Appellate Division to reverse the judgment upon the facts, and it was its duty to do so, if, upon a review of the case, that court came to the conclusion that the plaintiff had failed to show negligence in the defendant and absence of negligence on the part of his intestate. Its power, in that respect, is unlimited and beyond our review. It has not done so in the present case and our review is, therefore, confined to errors of law.

This case was so close an one, upon its facts, that if any error of law was committed by the trial judge, which can be seen to have been material and which might have unduly influenced the jury adversely to the defendant's interest, it should be available to it. Such an error, I think, is to be distinctly found in the charge of the trial court, when commenting upon the testimony of the witness Tuttle. The negligence, which was charged in the complaint, was that the defendant's train approached the " crossing without sufficient warning and without using due care and prudence in the management of its train and without giving notice of its approach." Upon that issue, the testimony was sharply conflicting. For the plaintiff, it was testified that the train gave no warning of its approach, by bell, or by whistle. For the defendant, it was testified, by a greater number of witnesses, that the usual signals, by whistle and by an automatic bell, were given. Of the plaintiff's evidence, that given by Tuttle was, perhaps, the most important, as bearing upon this point. He had testified that, after the plaintiff and his family had left his house, he saw, from a point near his house, the train coming from Keefe's crossing, a half mile distant, and that it

gave no signal of its approach to the station.   To offset that
evidence, the defendant had endeavored to prove, in the
situation which he had described, that it was physically impos-
sible for him to have seen the train, until the engine had
passed the whistling post for Tuttle's crossing.   The trial
judge, in charging the jury upon this question of whether
any notice was given of the train, said : "Upon that point,
gentlemen, the plaintiff has called Mr. Tuttle, who testified
that after the plaintiff and his family left his house that
evening, which was about 12 o'clock, he went out to feed his
pigs and while he was out near the pig pen he saw this train in
question as it went down past the station, and he did not hear
the whistle blow or the bell ring.   His testimony, however, is
attacked by the defendant, who has produced maps of Tuttle's
premises to convince you that his testimony is false ; that he
could not have seen this train from the position he occupied.
It is for you to say whether Mr. Tuttle has perjured himself,
or not.   He has either perjured himself or he has told you
the truth, that he saw this train ; for he could not be mistaken
from the description he gave of the train.   He has either
deliberately perjured himself, or he has told you the truth.
You saw him upon the stand and you had an opportunity to
judge from his appearance, and the manner in which he
gave his testimony, whether he was telling the truth or not.
Taking his family connections and his standing in the com-
munity into consideration, it is for you to say whether Mr.
Tuttle deliberately committed perjury or not.   It is not for
me to say, gentlemen, but it is for you to determine that
question."   At the conclusion of the charge, the defendant's
counsel excepted to that part "wherein the court spoke of
Mr. Tuttle's testimony and stated to the jury that they
must find one way or the other."   To this the court answered :
"I said in reference to seeing the train ; that is the way I
put it.   I said he could not have probably been mistaken.
He either saw the train or he did not see it."   The remarks
of the trial judge, upon the taking of the exception, did not
cure any error in his charge.   His reference to what he had

charged was, manifestly, inexact.  It, in nowise, moderated, or modified, its extreme tenor.   I think his instructions to the jury, upon the subject of Tuttle's testimony, were erroneous and they could not have failed to be prejudicial to the defendant's case.   The province of the jury was distinctly invaded, when the trial judge referred to that testimony, in such a way as to constrain the jury to find it to have been deliberately false, or to have been true; for the jurors were, thus, not left free to disregard it, as simply mistaken.  If their judgment had not been constrained by this instruction, they might have found that Tuttle was mistaken as to the facts, which he testified to, and, therefore, that his testimony should not be relied upon in deciding the issue.   The remarks of the trial judge were, in effect, an instruction that the jurors had no option, in the matter, to find otherwise than that Tuttle, either, had intentionally sworn falsely as to an important fact, or, had told the exact truth about it.   He left the decision to them whether Tuttle perjured himself, or not, and he left them no middle course.   They could not attribute the witness' statements to some inaccuracy of memory; or to a mistake in his recollection of the point from which he had seen the train.   They were not permitted to reconcile, if possible, the testimony with that given by other witnesses.   In a sense, it was true that Tuttle spoke the truth, or spoke falsely; but the legal error was in the trial judge's forcing the jurors to find one way, or the other, upon such an issue.   The relation of a fact from memory may be false, with no intention to deceive, and positive testimony by a witness may be unreliable, without willful perjury being attributable to him.   (*Pierce v. Brady*, 23 Beavan, at p. 70.)   They were placed in a position, where their verdict for the defendant would, in a public manner, stamp a prominent member of the community as a perjurer; which they might well have shrunk from doing in a close case, if that was to be one of the results of their verdict for the defendant.   The charge tendered a false issue and diverted their minds from their true duty; which was to consider all of the testimony, to weigh it carefully, to test the credit

to be given to a witness by his apparent intention to speak the truth and by the accuracy of his memory, to reconcile, if possible, conflicting statements as to material facts and, in such ways, to get at the truth and to reach a just verdict upon the issues.

If, upon these very obvious propositions, authorities are needed, the following may be referred to and, particularly, the discussion by Chancellor KENT in *N. Y. Firemen Ins. Co.* v. *Walden* (12 Johns. at p. 518); referred to by Judge ALLEN in *Massoth* v. *D. & H. C. Co.* (64 N. Y. 524, 534). (And see *Hoffman* v. *N. Y. C. & H. R. R. R. Co.*, 87 N. Y. 25; *McKenna* v. *People*, 81 ib. 360; *People* v. *Brow*, 90 Hun, 509.)

For these reasons, I think there should be a reversal of the judgment and a new trial; with costs to abide the event.

PARKER, Ch. J., O'BRIEN, MARTIN, VANN and CULLEN, JJ., concur; WERNER, J., not voting.

Judgment reversed, etc.